# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LSVC HOLDINGS, LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff/Counterclaim-Defendant, | ) ) | |
| v. | ) ) | C.A. No. 8424-VCMR |
| VESTCOM PARENT HOLDINGS, INC., a Delaware corporation, | ) ) ) ) | |
| Defendant/Counterclaim-Plaintiff, | ) ) | |
| and | ) ) | |
| VPH CLAIM HOLDING, LLC, a Delaware limited liability company, | ) ) ) | |
| Counterclaim-Plaintiff. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  September 29, 2017
Date Decided: December 29, 2017

Lewis H. Lazarus, MORRIS JAMES LLP, Wilmington, Delaware; Stephen C. Hackney and Timothy W. Knapp, KIRKLAND & ELLIS LLP, Chicago, Illinois; *Attorneys for Plaintiff and Counterclaim-Defendant.*

William M. Lafferty and Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jody C. Barillare, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; Kevin O'Mara, Kenneth I. Schacter, and Michael E. Tracht, MORGAN, LEWIS & BOCKIUS LLP, New York, New York; *Attorneys for Defendant and Counterclaim-Plaintiffs.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This case involves the world of transaction tax deductions ("TTDs"). TTDs are transactional expenses (such as professional fees and compensatory payments for options cancellations or bonuses) incurred by an acquired company, that can be claimed as tax deductions. TTDs may be realized in at least three ways: (1) as a reduction in pre-closing taxable income; (2) as a post-closing refund for either pre-closing tax overpayments or net operating losses ("NOLs") carried back to earlier periods; or (3) as a reduction in post-closing taxable income for either costs deductible in post-closing periods or NOLs carried forward to post-closing periods. I note here the importance of timing. To the extent not otherwise contractually dictated, the first method to realize TTDs occurs pre-closing and benefits the target company, while the latter two situations occur post-closing and benefit the acquirer.

The TTDs in the instant case arise from the sale of a manufacturer of retail shelving labels, Vestcom International, Inc. ("Vestcom" or the "Company"), between sophisticated financial actors. The parties entered into a Stock Purchase Agreement (the "Agreement") governing the transaction. Between the signing of the Agreement and closing of the transaction, Vestcom claimed the entirety of the TTDs on its pre-closing taxes. The acquiring parties contend that the Agreement bars Vestcom from realizing the full amount of the TTDs as a reduction in pre-closing taxable income. Instead, the acquirers assert that the Agreement mandates

1

a 50/50 split of the value of the TTDs, regardless of how or when realized. Vestcom's former owner disagrees, arguing that the Agreement only requires a 50/50 split of any TTDs realized post-closing and does not prevent the Company from claiming all available TTDs on its pre-closing tax filings.

After examining the terms of the Agreement and the evidence presented at trial, I conclude that the Agreement allows Vestcom to claim the full amount of the TTDs pre-closing.

## I.    BACKGROUND

The facts in this opinion are my findings based on the parties' stipulations, 161 trial exhibits, including deposition transcripts, and the testimony of ten live witnesses presented at a four-day trial before this Court that began on May 8, 2017. I grant the evidence the weight and credibility that I find it deserves.[1]

### A.    Key Parties

Plaintiff and Counterclaim-Defendant LSVC Holdings, LLC ("LSVC") is an entity jointly owned by two private equity firms, Lake Capital Partners ("Lake Capital") and The Stephens Group, LLC (the "Stephens Group").[2] Doug Rescho is

---

[1]    Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the name of the speaker. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended. Exhibits are cited as "JX #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs, and citations to the oral argument transcript refer to the post-trial oral argument.

[2]    Tr. 985 (Sorrells).

a principal at Lake Capital.[3]  At the Stephens Group, Wesley Kent Sorrells is a managing director,[4] and Ronald Clark is the Chief Operating Officer and general counsel.[5]

Private equity firm Court Square Capital Partners ("Court Square") owns Defendant and Counterclaim-Plaintiff Vestcom Parent Holdings, Inc. ("VPH").[6] Counterclaim-Plaintiff VPH Claim Holding, LLC  ("VCH") is the "assignee of VPH's rights, title, and interest in the [Vestcom] Stock Purchase Agreement and VPH's claims against LSVC in connection with the Stock Purchase Agreement."[7] At Court Square, John P. Civantos is a managing partner,[8] and Kevin A. White is a principal.[9]

Shannon Palmer is the Chief Financial Officer ("CFO") of Vestcom.[10]

---

[3]    *Id.* at 31-32 (Civantos).

[4]    *Id.* at 983 (Sorrells).

[5]    *Id.* at 1123 (Clark).

[6]    *Id.* at 8-9 (Civantos).

[7]    VPH/VCH Second Amended Verified Counterclaims ¶ 6.

[8]    Tr. 10 (Civantos).

[9]    *Id.* at 16 (Civantos).

[10]    *Id.* at 501 (Palmer).

## B. Pertinent Facts

I detail the facts necessary to allocate the value of the TTDs arising from the Vestcom transaction in accordance with the parties' agreement.

### 1. The parties negotiated the transaction

Lake Capital and the Stephens Group created LSVC to acquire Vestcom in April 2007.[11] During the summer of 2012, LSVC put Vestcom up for sale.[12] Court Square created VPH to bid on and potentially acquire LSVC.[13] VPH emerged as the winning bidder in LSVC's sale process, and the parties began negotiations.[14]

In connection with the potential transaction, LSVC hired Robert W. Baird & Co. Incorporated ("Baird") as advisor and exclusive agent for communications regarding a potential transaction.[15] Andrew Snow was the lead banker from Baird on the deal.[16] LSVC also retained Kirkland & Ellis (LLP) ("Kirkland & Ellis") as legal advisor.[17] From Kirkland & Ellis, Robert Wilson served as the lead deal

---

[11]     *Id.* at 985 (Sorrells).

[12]     *Id.* at 986 (Sorrells).

[13]     *Id.* at 8-9 (Civantos).

[14]     *Id.* at 992 (Sorrells).

[15]     JX 6 at 3.

[16]     Tr. 994 (Sorrells).

[17]     *Id.* at 988 (Sorrells).

lawyer,[18] and Kevin Coenen was the lead tax attorney.[19] Court Square retained Jones Day as legal advisor in connection with the transaction.[20] Kevin O'Mara served as the lead deal attorney from Jones Day.[21] Civantos and Snow conducted principal-to-principal negotiations between LSVC and VPH.[22]

In negotiating the sale, the parties focused on, *inter alia*, the TTDs. Each side began with an attempt to seize the full value of the deductions. LSVC's first draft of the Agreement, sent in September 2012, proposed that VPH pay to LSVC 100% of the value of the TTDs as part of the purchase price.[23] Court Square responded by striking the language in the draft[24] so as not to bear the cost of the TTDs.[25]

As a compromise, LSVC decided to propose that the parties split the value of the TTDs. On October 3, 2012, Snow and Civantos discussed the TTDs, and

---

[18]     *Id.* at 699 (Wilson).

[19]     *Id.* at 831 (Coenen).

[20]     *Id.* at 29 (Civantos).

[21]     *Id.* at 72 (Civantos).

[22]     *Id.* at 16-17 (Civantos).

[23]     JX 9 § 1.02.

[24]     JX 11 at 2.

[25]     Tr. 30 (Civantos).

Snow tentatively offered to "split[] [the TTDs] down the middle."[26] Following that discussion, Snow updated Sorrells, stating that Snow communicated the TTD plan to Civantos but that Civantos's "body language wasn't very accommodative on the material economic point (tax benefits) . . . we'll see."[27] Later that day, Snow and Civantos had a follow-up conversation, during which the parties discussed various terms, including the TTDs. Snow and Civantos agreed that "50% of trans[action] tax benefits [would] be paid to sellers [LSVC] as and when realized," as long as LSVC would accept "pre-closing tax indemnity being back to dollar one."[28] Snow testified that the TTD portion of the discussion lasted between "30 seconds and one minute" and did not include any of the "mechanics of how the parties would share TTDs."[29] During that conversation, Snow stated that the TTDs would be worth between $6-$7 million.[30] After Snow conveyed the outcome of the conversation to LSVC, Sorrells told him, "Good job on getting the split."[31]

---

[26]     *Id.* at 1189 (Snow).

[27]     JX 13.

[28]     JX 14.

[29]     Tr. 1208 (Snow).

[30]     *Id.* at 38 (Civantos).

[31]     JX 16.

On October 4, 2012, VPH sent an initial draft of the letter of intent (the "Letter of Intent") to LSVC that did not mention the TTDs.[32] LSVC returned an edited draft of the Letter of Intent into which it inserted the following provision regarding the TTDs: "[VPH] would pay over to the seller [LSVC] 50% of the benefit of any transaction tax deductions on an 'as and when realized' basis."[33] The parties then signed the Letter of Intent.[34] Civantos and Snow each recognized that their respective attorneys would work out the details of the deal when they took over drafting.[35]

Following the Letter of Intent, Kirkland & Ellis and Jones Day took over drafting the Agreement. The attorneys exchanged ten drafts of the Agreement before the final executed version. The key changes related to the TTDs occurred in Sections 3.08 and 9.01 of the Agreement.

On October 21, 2012, Jones Day sent a redline to LSVC's first draft of the Agreement.[36] Jones Day rejected a provision which stated that Section 3.08 of the Agreement contained the only representations and warranties relating to taxes and

---

[32]  JX 18.

[33]  JX 23.

[34]  JX 21.

[35]  Tr. 1210-12 (Snow); *Id.* at 152 (Civantos).

[36]  JX 27.

represented that Vestcom "paid or properly accrued" all pre-closing taxes.[37] Jones Day added a provision whereby VPH would retain 50% of the value of the TTDs "[t]o the extent that [VPH] actually receives a refund or realizes a reduction in its Taxes as a direct result of any Transaction Tax Benefits."[38] Finally, Jones Day sought to require Vestcom to file pre-closing tax forms "without regard to" the TTDs and to "submit such Tax Return" to VPH in advance of filing.[39]

Kirkland & Ellis replied with a new draft of the Agreement on October 27, 2012.[40] Section 3.08 of this draft again contained the language struck by Jones Day in the October 21 draft that Section 3.08 contained the only representations and warranties related to Vestcom's pre-closing taxes.[41] Kirkland & Ellis altered the representation on pre-closing taxes to specify that LSVC would pay taxes "due and payable."[42] Kirkland & Ellis deleted Jones Day's provisions requiring Vestcom to file pre-closing taxes without regard to the TTDs and to show VPH the

---

[37]     *Id.* § 3.08.

[38]     *Id.* § 9.01(a).

[39]     *Id.*

[40]     JX 29.

[41]     *Id.* § 3.08(u).

[42]     *Id.* § 3.08(a).

8

tax returns prior to filing.[43]  Kirkland & Ellis then deleted the term allowing VPH to retain 50% of the TTDs.[44]  Kirkland & Ellis added two provisions, the first—entitled "Tax Refunds"—stipulating that VPH retain 50% of any post-closing tax refunds[45] and the second—entitled "Post-Closing Tax Savings"—allowing VPH to retain 50% of the value of any post-closing tax savings.[46]  Kirkland & Ellis also added a provision entitled "Transaction Tax Deductions," stating that "[i]n connection with the preparation of [post-closing] Tax returns . . . all Transaction Tax Deductions shall be treated as properly allocable to the Pre-Closing Tax Period ending on the Closing Date and such Tax Returns shall include all Transaction Tax Deductions as Deductions."[47]  The provisions relating to splitting tax refunds and savings fell within Section 9.01 (within Article IX) of the Agreement.

On November 3, 2012, Jones Day responded with a new draft.[48] Again, Jones Day deleted the term that Section 3.08 contained the only tax

---

[43]     *Id.* § 9.01(a).

[44]     *Id.*

[45]     *Id.* § 9.01(e).

[46]     *Id.* § 9.01(b).

[47]     *Id.* § 9.01(a).

[48]     JX 36.

9

representations[49] and reinserted the requirement that Vestcom send VPH its pre-closing tax forms before filing.[50] Jones Day did not strike LSVC's proposal to share 50% of post-closing tax refunds and 50% of post-closing tax savings. Instead, Jones Day specified that VPH "shall not be required to pay over 50% of such refund or amount credited to the extent that such refund or credit does not related to a [TTD]."[51] Jones Day also deleted Kirkland & Ellis's language requiring VPH to include the full amount of the TTDs on the post-closing tax filing.[52]

On November 8, 2012, Kirkland & Ellis replied to Jones Day with the next draft of the Agreement.[53] Kirkland & Ellis added back into Section 3.08 the provision that all pre-closing tax representations were contained in Section 3.08[54] and removed the provision allowing VPH access to pre-closing tax returns prior to filing.[55] Kirkland & Ellis then deleted the provision that entitled VPH to 100% of

---

[49]     *Id.* § 3.08(p).

[50]     *Id.* § 9.01(a).

[51]     *Id.* § 9.01(e).

[52]     *Id.* § 9.01(j).

[53]     JX 44.

[54]     *Id.* § 3.08(p).

[55]     *Id.* § 9.01(a).

non-TTD related pre-closing tax refunds.[56] Finally, Kirkland & Ellis reinserted the term requiring VPH to reflect the full amount of the TTDs on post-closing tax returns.[57]

On November 18, 2012, Jones Day sent an updated draft of the Agreement to Kirkland & Ellis.[58] This draft did not contain changes relevant to the tax provisions. On November 20, 2012, Jones Day sent another draft of the Agreement to Kirkland & Ellis.[59] In this draft, Jones Day altered the language in Section 3.08 to state that the Agreement contained Vestcom's pre-closing tax representations and warranties in "Section 3.04, Section 3.13, Section 3.15[,] . . . Article IX [(which contains the provisions concerning splitting 50% of any tax refunds and savings), and] Section 3.08."[60]

On November 24, 2012, Kirkland & Ellis returned a draft of the Agreement to Jones Day.[61] In this draft, Kirkland & Ellis removed language stating that

---

[56] *Id.* § 9.01(e).

[57] *Id.* § 9.01(j).

[58] JX 52.

[59] JX 55.

[60] *Id.* § 3.08(p).

[61] JX 58.

Article IX also contained representations and warranties related to pre-closing tax matters.[62]

On November 26, 2012, Jones Day sent a draft of the Agreement.[63] This draft contained language allowing VPH to prepare the post-closing deduction statement before LSVC would review it.[64] Jones Day also removed language in this draft that would have given LSVC 100% of the value of pre-closing tax savings from net operating losses.[65]

Kirkland & Ellis replied that same day to Jones Day, accepting Jones Day's changes from its earlier November 26 draft.[66] Kirkland & Ellis sent a final draft of the Agreement on November 27, 2012, which did not contain any pertinent changes to the tax treatment.[67]

---

[62]    *Id.* § 3.08(p).

[63]    JX 74.

[64]    *Id.* § 9.01(j).

[65]    *Id.* § 9.01(k).

[66]    JX 73.

[67]    JX 89.

12

### 2. Vestcom, LSVC, and VPH executed the finalized Agreement

Vestcom, LSVC, and VPH executed the Agreement on November 27, 2012.[68] The following provisions bear on the TTDs. Section 3 of the Agreement contains Vestcom's representations and warranties. In Section 3.08, Vestcom represented and warranted that "[a]ll Taxes due and payable . . . have been timely paid or properly accrued on the Company's books and records."[69] As a condition to VPH's obligations, Vestcom's Section 3.08(a) tax representation must be true at both the signing and closing dates.[70]

Article IX of the Agreement details the treatment of taxes—specifically TTDs, tax refunds, and post-closing tax savings—in the transaction. Section 9.01(a) states that all tax returns filed by VPH "shall be prepared consistent with the past practices of [Vestcom]."[71] Regarding the TTDs, Section 9.01(j) states:

> In connection with the preparation of Tax Returns . . . [VPH and LSVC] agree that, except for any Transaction Tax Deductions that are not "more likely than not" deductible in the Pre-Closing Tax Period, all Transaction Tax Deductions shall be treated as properly allocable to the Pre-Closing Tax Period ending on the Closing Date

---

[68]   JX 75.

[69]   *Id.* § 3.08(a).

[70]   *Id.* § 2.01(a).

[71]   *Id.* § 9.01(a).

and such Tax Returns shall include all Transaction Tax Deductions.[72]

Section 9.01(e) of the Agreement—entitled "Tax Refunds"—states that "to the extent [a] [t]ax refund or credit is attributable to Transaction Tax Deduction . . . [VPH] shall have the right to retain 50% of the TTD Refund/Credit."[73] Section 9.01(k)—entitled "Post-Closing Tax Savings"—provides that "to the extent [a] reduction in [t]ax payments is attributable to . . . Transaction Tax Deductions . . . , [VPH] shall have the right to retain 50% of the TTD Tax Payment Savings."[74]

Also relevant to the TTDs is the purchase price adjustment contained in the Agreement, which adjusts the deal consideration based on the difference between Vestcom's estimate pre-closing and VPH's calculation post-closing of the Company's "Net Working Capital, Cash on Hand and Indebtedness."[75] "If the Net Working Capital as . . . determined [by VPH post-closing] is less than the Estimated Net Working Capital [calculated by Vestcom pre-closing], . . . [the parties] shall promptly cause an amount equal to the amount of such shortfall to be

---

[72]    *Id.* § 9.01(j).

[73]    *Id.* § 9.01(e).

[74]    *Id.* § 9.01(k).

[75]    *Id.* § 1.06(b).

14

paid to [VPH] from the Working Capital Escrow Account."[76] Under the Agreement,

> "Net Working Capital" means (as finally determined under Section 1.06) (a) current assets excluding Cash on Hand and deferred tax assets less (b) the sum of accounts payable, accrued expenses and deferred revenue plus (c) the sum of accrued and unpaid interest related to Indebtedness, accrued restructuring charges[,] . . . accrued severance and related benefits and accrued litigation settlement payments.[77]

Section 1.06 requires that "Net Working Capital . . . be determined on a consolidated basis in accordance with GAAP."[78] The Net Working Capital definition states that "Net Working Capital shall be calculated in accordance with the Example Net Working Capital attached as Exhibit H."[79] The example in Exhibit H contains a line item for "Income Tax Payable" but not for income tax receivable.[80]

Finally, Section 5.01 of the Agreement requires that Vestcom "use its commercially reasonable efforts to conduct the Business in the ordinary course of

---

[76]    *Id.* § 1.06(c)(i).

[77]    *Id.* at Art. X.

[78]    *Id.* § 1.06(b).

[79]    *Id.* at Art. X.

[80]    *Id.* at Ex. H.

business consistence with past practice" between the signing of the Agreement and the closing of the transaction.[81]

### 3. Vestcom utilized 100% of the TTDs pre-closing

On December 17, 2012, Vestcom completed its fourth quarter tax payment of $1,070,000 to the IRS.[82] As CFO, Palmer used an outside tax advisor, BKD, to estimate Vestcom's tax liability.[83] Palmer believed that the transaction would close before the end of 2012,[84] and thus, Palmer and BKD included the value of the TTDs in making the tax payment.[85]

The transaction closed on December 27, 2012.[86]

### 4. The parties bring the instant case

On a February 21, 2013 conference call regarding the final net working capital adjustment, VPH learned from Palmer that there would not be a refund for VPH from any TTDs because LSVC claimed them pre-closing.[87] On February 25,

---

[81]    *Id.* § 5.01(d).

[82]    Tr. 592 (Palmer).

[83]    *Id.* at 559-60 (Palmer).

[84]    *Id.* at 561 (Palmer).

[85]    *Id.* at 563-64 (Palmer).

[86]    *Id.* at 443 (White).

[87]    *Id.* at 531-32 (Palmer).

2013, VPH delivered a letter to LSVC alleging breach of the Agreement.[88] LSVC's reply letter denied any breach of contract.[89]

On March 19, 2013, LSVC filed this case against VPH for breach of the Agreement for failure to release funds from escrow.[90] The Court dismissed the original claims pursuant to a stipulated settlement between the parties,[91] so that the only remaining claims are VPH counterclaims against LSVC for allegedly claiming the TTDs improperly. Finding the language of the Agreement ambiguous as to the mechanics for claiming the TTDs and the calculation of net working capital,[92] the Court denied an LSVC motion to dismiss[93] and cross motions for summary judgments[94] and held trial.

## II.     ANALYSIS

"Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable

---

[88]      JX 112.

[89]      JX 127.

[90]      LSVC Verified Complaint ¶ 1.

[91]      Pre-Trial Stipulation and Order 5-6.

[92]      *Id.* at 6.

[93]      Telephonic Rulings of the Ct. 6-8, 15 (Oct. 11, 2013).

[94]      Pre-Trial Stipulation and Order 18.

17

third party."[95]  "When interpreting a contract, this Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."[96]  The terms of the contract control "when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[97]  Standard rules of contract interpretation state that "a court must determine the intent of the parties from the language of the contract."[98]

"In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract.  This is true in all commercial contexts, but especially so when the contract at issue involves . . . [the] sale of an entire business."[99]  "When a contract's plain meaning, in the context of the overall structure of the contract, is susceptible to more than one reasonable

---

[95]     *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[96]     *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[97]     *Id.* at 368 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[98]     *Id.* (quoting *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003)).

[99]     *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913-14 (Del. 2017).

18

interpretation, courts may consider extrinsic evidence to resolve the ambiguity."[100] Such extrinsic evidence may include "the history of negotiations, earlier drafts of the contract, trade custom, or course of performance."[101] "After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation."[102]

At the motion to dismiss and summary judgment stages in the instant case, the Court found the Agreement ambiguous in its treatment of the TTDs. After reviewing the evidence presented at trial, I conclude that the Agreement allows only one objectively reasonable meaning, namely that Vestcom was free to claim 100% of the TTDs to reduce pre-closing taxable income, but VPH would have to remit 50% of the value of any post-closing refunds or reductions in taxable income to LSVC.

### A. VPH and LSVC Each Offer Reasonable Interpretations of the Agreement

This dispute centers on Sections 3.08, 5.01, and 9.01 of the Agreement. Both VPH and LSVC offer reasonable readings of these terms of the Agreement.

---

[100] *Salamone*, 106 A.3d at 374 (citing *In re IBP, Inc. S'holder Litig.*, 789 A.2d 14, 55 (Del. Ch. 2001)).

[101] *In re Westech Capital Corp.*, 2014 WL 2211612, at *9 (Del. Ch. May 29, 2014).

[102] *Salamone*, 106 A.3d at 374-75 (alteration in original) (quoting *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013)).

VPH, who bears the burden as Counterclaim-Plaintiff, argues that the analysis must begin with Section 9.01. VPH asserts that Section 9.01(j) of the Agreement gives VPH "control of the calculation and distribution of all TTDs."[103] VPH avers that, because it "shall include all Transaction Tax Deductions" on the post-closing tax returns, this necessarily implies that the Agreement bars LSVC from claiming any TTDs pre-closing, and the only remaining methods to realize the TTDs occurred post-closing, after VPH took control of the Company.[104] VPH contends that to hold otherwise would make this portion of the contract "mere surplusage."[105]

VPH adds that LSVC's decision to claim the TTDs pre-closing was outside of the ordinary course of business in violation of Section 5.01 because (1) there was no guarantee the transaction would close before December 31, in which case the TTDs would not apply to the 2012 tax year, and (2) "a major transaction that would significantly impact Vestcom's tax liability, such as [the challenged]

---

[103]     VPH/VCH Opening Br. 18.

[104]     *Id.* at 48.  Section 9.01(j) states that "[i]n connection with the preparation of [post-closing] Tax Returns . . . [VPH and LSVC] agree that, except for any Transaction Tax Deductions that are not 'more likely than not' deductible in the Pre-Closing Tax Period, all Transaction Tax Deductions shall be treated as properly allocable to the Pre-Closing Tax Period ending on the Closing Date and such Tax Returns shall include all Transaction Tax Deductions."  JX 75 § 9.01(j).

[105]     VPH/VCH Opening Br. 49 (quoting *Summers v. Walnut Ridge Cmty. Ass'n, Inc.*, 2015 WL 6694093, at *3 (Del. Ch. Nov. 3, 2015)).

20

acquisition, was entirely out of the ordinary for the [C]ompany."[106] Further, VPH argues that Section 3.08 "had nothing to do with the parties' agreement to split TTDs," and thus, the Court may look to Section 9.01 for guidance on the treatment of the TTDs pre-closing.[107]

LSVC responds that the analysis should begin and end with Section 3. Under Section 3.08, all representations and warranties related to pre-closing taxes are contained in identified provisions in Section 3 of the Agreement.[108] LSVC maintains that, without a compelling explanation from VPH, the Court should not even look outside of Section 3 to determine the treatment of pre-closing tax filings.

LSVC adds that, in light of the actual closing date of the transaction, the provisions requiring the Company to operate in the ordinary course of business obligated Vestcom to claim the TTDs pre-closing. Sections 3.08(a) and 5.01 of the Agreement require that Vestcom pay "[a]ll Taxes due and payable"[109] in a manner

---

[106]   VPH/VCH Reply Br. 20.

[107]   *Id.* at 17. "This is because the ring fence language in Section 3.08 is a representation and warranty pertaining to something that happened in the *past*, while the TTD provisions in the Tax Matters section in Article IX—the provisions on which the Court sought extrinsic evidence—were prospective covenants governing conduct in the *future*." *Id.*

[108]   JX 75 § 9.01(p).

[109]   *Id.* § 3.08(a). Section 3.08(a) itself is a pre-closing representation, and Section 2.01(a) of the Agreement "brings down" the representation at closing, making the term also a representation that Vestcom paid all taxes due and payable at closing.

"consistent with past practice [of] the Company."[110] LSVC contends that Vestcom generated its pre-closing tax returns using the "same tax estimating process" as in prior quarters, under which the Company projected its full-year tax liabilities, including expenses that are "more likely than not," and paid its taxes accordingly.[111] LSVC also proffers that under VPH's reasoning, all of Vestcom's actions surrounding the transaction would be out of the ordinary course because acquisition is not an ordinary event, and this would be an absurd result.

LSVC states that even if the Court looks outside of Section 3.08 to determine the treatment of the TTDs pre-closing, Section 9.01 of the Agreement only provides for a payment *from* VPH *to* LSVC of post-closing benefits.[112] LSVC points out that notably absent from the Agreement is a term requiring LSVC to make a payment or retain only a certain portion of a refund or reduction realized pre-closing. LSVC argues that this framework for a payment only from VPH to LSVC is consistent with the executed Letter of Intent, which states: "[VPH] would

---

[110]   JX 75 § 5.01.

[111]   Tr. 559-61 (Palmer).

[112]   To the extent VPH were to receive a refund post-closing as a result of a TTD, Section 9.01(e) states that "[VPH] shall have the right to retain 50%" of said refund. JX 75 § 9.01(e). And to the extent that the TTDs reduce VPH's post-closing tax burden, Section 9.01(k) states that "[VPH] shall have the right to retain 50% of the . . . [s]avings." *Id.* § 9.01(k). These clauses only concern post-closing benefits, and compliance with each requires a one-way transfer from VPH to LSVC.

pay over to the seller [LSVC] 50% of the benefit of any transaction tax deductions on an 'as and when realized' basis."[113]

LSVC also offers a coherent response to the "mere surplusage" argument. A requirement to list the total amount of the TTDs on post-closing tax returns does not on its face prevent Vestcom from claiming the TTDs on pre-closing tax returns. Instead, the actual text to which LSVC agreed simply requires VPH to list the total amount of the TTDs on post-closing returns. Under LSVC's interpretation, even if LSVC used the TTDs to prepare pre-closing estimates, VPH must still list the TTDs on post-closing tax returns to prevent VPH from creating an artificial tax indemnity for which LSVC would be liable.[114] While this alternative purpose for Section 9.01(j) prevents the term from being mere surplusage, the parties' arguments reveal a tension in the Agreement, particularly between the one-way payment mechanism and the language in Section 9.01(j) requiring VPH to list the TTDs on post-closing tax returns. This tension necessitates examination of extrinsic evidence.

---

[113]    JX 23.

[114]    LSVC indemnified VPH for any losses related to tax payments pre-closing.  JX 75 § 7.02(a)(v).

**B.** **The Extrinsic Evidence Presented at Trial Confirms LSVC's Interpretation of the Agreement**

At trial, VPH and LSVC presented extrinsic evidence regarding the history of the negotiations and the actions of the parties. VPH contends that the extrinsic evidence demonstrates that, despite the lack of a provision requiring a payment from LSVC to VPH related to pre-closing TTDs, and despite an express prohibition on LSVC from claiming the TTDs pre-closing, the agreement between LSVC and VPH was a "horse trade" to split the TTDs 50/50 in all circumstances, no matter the mechanics.[115] LSVC responds that the terms of the Agreement itself only specify a payment from VPH to LSVC for post-closing refunds or savings and that the extrinsic evidence supports this interpretation.[116] I find that the extrinsic evidence supports LSVC's interpretation of the Agreement.

**1.** **History of the negotiations leading to the Letter of Intent**

The parties presented evidence of their respective understandings of the negotiations. At the outset, each party wanted to claim the entirety of the TTDs. LSVC's first draft of the Agreement proposed that VPH pay 100% of the value of

---

[115] VPH/VCH Opening Br. 27.

[116] LSVC Answering Br. 47-48.

the TTDs as part of the purchase price.[117]   VPH rejected that provision in an attempt to retain the full value of the TTDs.[118]

In order to bridge the gap between the parties, LSVC proposed that VPH pay LSVC 50% of any TTD value "as and when realized."[119]   Snow communicated this proposal to Civantos on October 3, 2012 and, in exchange, offered that LSVC would provide pre-closing tax indemnity "back to dollar one."[120]   While this conversation created an overarching structure for the transaction, Snow stated that the parties did not reach a "comprehensive agreement;" they expected the lawyers to work out the details in the Agreement.[121]

The parties formalized this proposal in the Letter of Intent, which provided that "[VPH] would pay over to the seller [LSVC] 50% of the benefit of any transaction tax deductions on an 'as and when realized' basis."[122]   Civantos's testimony at trial centered on the "as and when realized" language, contending that

---

[117]     JX 9 § 1.02.

[118]     Tr. 24-30 (Civantos).

[119]     JX 14.

[120]     *Id.*

[121]     Tr. 1210-12 (Snow).

[122]     JX 23.   VPH's first draft of the Letter of Intent did not contain any provision related to the TTDs. JX 18.   But LSVC's reply draft contained the aforementioned TTD language.   JX 23.   VPH signed the Letter of Intent without making any edits. Tr. 754 (Wilson).

this provision implied that "whatever shape, form, or manner of transaction benefits were realized, they would be shared 50/50."[123]  This, however, does not address why the Letter of Intent discussed only a payment *from* VPH *to* LSVC. When asked whether the language of the Letter of Intent accurately captured his understanding of the parties' intent, Civantos admitted, "I guess it depends on how you read it."[124]  But, like Snow, Civantos expected the lawyers to work out "[t]he actual language . . . once we negotiate the contract."[125]

### 2. Negotiations between the Letter of Intent and the Agreement

The parties presented an in-depth review of the drafting history of the Agreement that followed the execution of the Letter of Intent.  At the outset, VPH contends that the Court should overlook the drafting history because the true deal was struck by LSVC and VPH, not their respective attorneys.[126]  Unfortunately, VPH fails to identify any piece of evidence that explicitly states that the parties would split pre-closing tax benefits 50/50 under all circumstances.  Moreover, the actions of the attorneys (as agents) and the terms of the Agreement bind VPH, as well as LSVC.

---

[123]    Tr. 44 (Civantos).

[124]    *Id.* at 159 (Civantos).

[125]    *Id.* at 152 (Civantos).

[126]    VPH/VCH Opening Br. 40.

The drafting history demonstrates that LSVC rejected the proposed provisions that would have produced the outcome VPH now desires.[127] For instance, VPH inserted a term into a draft of the Agreement that would have required Vestcom to file pre-closing tax returns "without regard to [the TTDs]."[128] Undoubtedly, such a provision would bar LSVC from filing pre-closing tax returns utilizing the benefits of the TTDs; the Company clearly could not claim the TTDs on pre-closing tax returns "without regard to [the TTDs]."[129] LSVC, however, rejected that term in the following draft on October 27, 2012.[130] LSVC replaced this language with provisions governing post-closing "[t]ax refunds"[131] and the other "[p]ost-[c]losing [t]ax [s]avings."[132] As with the finalized Agreement, these provisions called for a payment from VPH to LSVC of 50% of any post-closing tax refunds or savings. Moreover, LSVC added Section 9.01(j) which requires VPH to list the total amount of the TTDs on post-closing tax returns and prevents

---

[127] Contrary to VPH's assertion, this does not turn the "principle of *contra proferentem* [under which the Court would construe an ambiguous term against the party that supplied the language] on its head." VPH/VCH Opening Br. 44. Instead, I simply recognize that VPH proposed the term it now seeks to enforce. LSVC outright rejected that term, and VPH still agreed to the Agreement.

[128] JX 27 § 9.01(a).

[129] *Id.*

[130] JX 29 § 9.01(a).

[131] *Id.* § 9.01(e).

[132] *Id.* § 9.01(b) (provision later properly labeled § 9.01(k)).

27

VPH from creating an artificial tax indemnity—for which LSVC would be on the hook—by claiming less than the total value of the TTDs post-closing.[133]  Notably absent from LSVC's proposed alterations to the Agreement is a provision requiring a payment from LSVC to VPH related to pre-closing tax savings.

And VPH understood the effects of this language.  Two days after LSVC deleted that language, Civantos complained that this rejection created "new points . . . that are atypical and were NOT in the original [Kirkland & Ellis] draft."[134] Snow responded that "most of the 'new' language [was] the plumbing required to flush out areas such as [the] tax matters section."[135]  VPH argues that Snow misled Civantos into thinking that the underlying business deal was unchanged.[136]  I disagree.  LSVC's rejections are consistent with its interpretation of the Letter of Intent, which dictated a split of the TTDs but not the scope or functionality of that split.

Moreover, LSVC's November 8 draft contained provisions detailing post-closing tax refunds and post-closing tax savings and requiring Vestcom to list all

---

[133]    Tr. 864-65 (Coenen).

[134]    JX 34.

[135]    *Id.*

[136]    VPH/VCH Opening Br. 14-15.

TTDs on post-closing tax returns,[137] consistent with the executed version of the Agreement. In response, on November 14, 2012, VPH sent a "major issues" list to LSVC identifying areas in the November 8 draft that VPH was still "review[ing]."[138] The "major issues" list characterized the language in Section 9.01 as "relating to how the parties will split refunds (if any) attributable to a pre-Closing period (including those arising from any Transaction Tax Deductions, etc.)."[139] This description of the Section 9.01 language suggests that VPH understood LSVC's changes as affecting tax refunds received post-closing, rather than guaranteeing a 50/50 split of the TTDs no matter when or how realized.

VPH also argues that the changes to Section 9.01 should not be interpreted in LSVC's favor because they would have reflected a material change to economic terms of the deal and any changes with economic consequences would not be made through redline drafts, but rather through principal-to-principal discussions.[140] This is not true. VPH's attorneys actually negotiated for a meaningful economic term by striking a provision in a November 26, 2012 draft that would have given LSVC 100% of the value of any TTD-related NOLs, transferring the benefit

---

[137]    JX 44 § 9.01.

[138]    JX 49.

[139]    *Id.*

[140]    VPH/VCH Opening Br. 14-15.

29

instead to VPH.[141]  Further, LSVC did not view the language as a new term but rather a reflection of the original agreement.

Similarly, on multiple occasions, VPH proposed, and LSVC rejected, versions of a provision allowing for Vestcom representations of pre-closing tax matters to fall outside of Section 3 of the Agreement.  VPH's drafts from October 21, November 3, and November 20, 2012 each allowed the Agreement to contain pre-closing tax representations in sections other than Section 3.[142]  Such a term might have implied that Section 9.01 contains pre-closing tax representations.  But LSVC rejected these provisions in succession on October 27, November 8, and November 24, 2012.[143]  VPH agreed by signing the final version of the Agreement, which states that "the only representations and warranties being made by the Company" with respect to pre-closing taxes fall within specified sections of Section 3.[144]  LSVC contends that this prevents VPH from looking to the language in Section 9.01 to infer pre-closing action (or inaction) on the part of Vestcom with respect to pre-closing taxes.  I find this explanation to be persuasive evidence of

---

[141]    JX 74 § 9.01(k).

[142]    JX 27 § 3.08; JX 36 § 3.08(p); JX 55 § 3.08(p).

[143]    JX 29 § 3.08(u); JX 44 § 3.08(p); JX 58 § 3.08(p).

[144]    JX 75 § 3.08(p).

how to read the Agreement; one should look to Section 3 for matters related to pre-closing taxes and Section 9.01 for matters related to post-closing taxes.

Regardless, VPH now contends that the business principals agreed to a 50/50 split of all TTD benefits no matter when or how realized and that the exchange of redlines between the attorneys simply documented the deal but did not change the basic meaning.[145]  As support, VPH correctly points out that no witnesses testified that the fundamental agreement changed between the Letter of Intent and the Agreement.[146]  The challenge with VPH's stance, however, is that LSVC's interpretation of the agreement does not reflect a change to the basic agreement outlined in the Letter of Intent.  The Letter of Intent simply stated an intent to split the TTDs; it did not detail the full range of circumstances under which that would be done or the mechanisms by which it would be carried out.[147]

---

[145]    VPH/VCH Opening Br. 42.

[146]    Tr. 55 (Civantos); *Id.* at 1196-97 (Snow); *Id.* at 1005 (Sorrells); *Id.* at 726 (Wilson); *Id.* at 920-24 (Coenen).

[147]    VPH also points to an email in which Palmers states that LSVC and VPH "decided to divvy up the tax benefit" in an attempt to show the parties agreed to a 50/50 split in all circumstances.  JX 32.  On October 30, 2012, Palmer sent Sorrells a request from VPH's tax advisors at PriceWaterhouseCoopers ("PWC") for information regarding Vestcom's tax position.  Palmer stated that PWC asked for the information because "you guys decided to divvy up the tax benefits."  JX 32.  Palmer's email and Sorrells' response—"Will do"—did not explicitly say that the terms restricted benefits to refunds.  Tr. 510 (Palmer).  Then, in the twenty-four hours before execution of the Agreement, White asked Snow for details on the TTD estimates.  JX 65.  Snow responded to White that he had "pinged K&E [Kirkland & Ellis] to check [the] status," *id.*, after which Snow forwarded K&E's

The lawyers then fleshed out the functioning of the TTD split through the drafts of the Agreement, as Snow and Civantos knew would happen.[148] The Letter of Intent, the redlined drafts of the Agreement, and the final Agreement all detail a possible payment from VPH to LSVC related to post-closing TTDs.[149] And consistent with both the Letter of Intent and the Agreement, if the Company underpaid its taxes pre-closing, LSVC would pay VPH 100% of the shortfall, while if the Company overpaid its pre-closing taxes or produced other post-closing benefits, VPH would retain 50% of the value of the refund or other savings and remit the remaining 50% to LSVC.[150]

---

response later that night. JX 70. White protested, asking for a more detailed schedule. JX 71. Snow replied that he estimated the TTDs for Civantos in October at roughly $6-$7 million. JX 69. But Civantos insisted on a more detailed schedule "so we all understand and agree on what is expected and there are no surprises." *Id.* Palmer created a schedule, JX 78, and after receiving permission from Sorrells to share, Snow sent VPH the TTD schedule. JX 77. This activity, along with VPH's testimony at trial, establishes that VPH cared strongly about the TTDs. *See, e.g.*, Tr. 441-42 (White). What it does not establish is the nature of the TTD split.

[148] Tr. 1210-12 (Snow); *Id.* at 152 (Civantos).

[149] LSVC Answering Br. 44-46.

[150] Tr. 728-29 (Wilson). VPH tries to advance the "forthright negotiator principle" to say that LSVC cannot enforce some secret understanding of an agreement that it did not communicate to the counterparty. VPH/VCH Opening Br. 24-25 (citing *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835-36 (Del. Ch. 2007)). But this argument fails. To the extent that either party has some undisclosed understanding of the Agreement, it is VPH in its argument that the true meaning of the agreement was a 50/50 split of the TTDs in all circumstances, regardless of the terms written into the Agreement. Indeed, as discussed *supra*, VPH tries to advance its theory of a 50/50 split in all cases despite the fact that LSVC struck

VPH now asks the Court to enforce against LSVC terms that LSVC explicitly struck from the Agreement but provides no compelling grounds on which to do so.  Accordingly, I decline.[151]

### 3. Actions after execution of the Agreement

VPH contends that the post-execution actions of the parties show that the Agreement entitled VPH to the full value of the TTDs.  VPH points to LSVC's behavior after VPH learned that Vestcom had claimed the TTDs pre-closing.  After Palmer told White about the Company's pre-closing tax returns, White was upset, believing "[t]hese guys pulled a fast one on us."[152]  Palmer apologized to White on

---

language producing that result from the Agreement.  JX 29 § 9.01(a).  VPH did not convey this understanding to LSVC (except in language that was struck by LSVC in the drafts of the Agreement), while LSVC expressed its understanding of the agreement by negotiating for deal terms that produced LSVC's desired real-world effects.  In fact, VPH may even have communicated that it understood LSVC's understanding of the agreement through the "major issues" list, discussed *supra*.

[151]    *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at \*8 (Del. Ch. June 21, 2012) ("Under basic principles of Delaware contract law, and consistent with Delaware's pro-contractarian policy, a party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table.  This principle applies with particular force when the supposedly aggrieved party in fact sought the specific contractual right at issue in negotiations but failed to get it.  This is because a court's role in interpreting contracts is 'to effectuate the parties' intent.'  For a court to read into an agreement a contract term that was expressly considered and rejected by the parties in the course of negotiations would be to 'create new contract rights, liabilities and duties to which the parties had not assented' in contravention of that settled role." (citations omitted)).

[152]    Tr. 451-52 (White).

a follow-up call, saying that he did not intend to breach the Agreement.[153] Palmer then informed Sorrells that Civantos and White were upset regarding the lack of a TTD refund post-closing.[154] Palmer and Sorrells looked to the Agreement to see if the agreement allowed for the escrow account to make whole any alleged shortfall in value.[155] Further, Civantos reached out to Sorrells regarding the alleged TTD issue on February 25, 2013, proposing that the parties "find a less cumbersome solution" to "save ourselves excessive brain damage."[156] In response, Sorrells stated that Palmer "mentioned to me the TTD issue" and that he would "take a look and then let's chat."[157]

VPH contends that, because LSVC did not immediately respond that there was no breach of the Agreement, LSVC must have known that it was in breach. I am not persuaded by this argument. Sophisticated private equity firms own LSVC and VPH. Upon learning that a transactional counterparty was upset over a deal, LSVC examined the underlying agreement and told VPH that it would "take a look

---

[153]    *Id.* at 452 (White).

[154]    *Id.* at 533 (Palmer).

[155]    *Id.* at 536 (Palmer).

[156]    JX 113.

[157]    JX 114.

34

and then let's chat."[158]  I cannot infer from LSVC's measured response that a lack of indignant outrage upon an accusation of violating a deal term demonstrates knowledge that the term was indeed breached.

*          *          *

The extrinsic evidence regarding the understanding of the negotiations and the actions of the parties establishes that the parties agreed to split the TTDs.[159] But the question for the Court is the scope of that split.  At best, VPH's arguments show a disconnect between Court Square principals and their own lawyers.  What they do not demonstrate is that, as of the signing of the Agreement, either LSVC or VPH agreed that LSVC would pay 50% of any TTDs claimed on pre-closing tax returns or that LSVC was aware of the disconnect.

## C.    LSVC's Interpretation Prevents an Unusual Overpayment of Taxes

LSVC's view benefits from the basic fact that it does not require an unusual overpayment to the IRS.  VPH's interpretation of the Agreement would have required Palmer to send an additional $6 million dollars to the IRS for Vestcom's fourth quarter tax payment, despite expenses that the Company was more likely than not to incur during that fiscal year. Palmer testified that doing so "would be

---

[158]    *Id.*

[159]    *See, e.g.*, JX 16 (Sorrells and Rescho congratulated Snow on "getting the split" after Civantos agreed to share the TTDs 50/50.).

very unnatural,"[160] and even VPH's expert witness agreed that "the idea is to pay the minimum to the IRS."[161] VPH responds that an additional payment of $6 million to the IRS would not constitute overpayment, but rather it would be a decision to not "risk underpay[ment] [on] its taxes by gambling that the TTDs would be available in the 2012 tax year."[162] I am not persuaded by this argument.

## D. LSVC's Interpretation Is Consistent with the Ordinary Course of Business

VPH contends that Vestcom acted outside the ordinary course of business, in violation of Section 5.01, when it claimed the TTDs pre-closing.[163] VPH argues that it is not ordinary for a company to claim TTDs because the transactions giving rise to such deductions do not occur in the ordinary course of business.[164] But this argument implies that LSVC would breach the Agreement regardless of whether Vestcom claimed the TTDs pre-closing because claiming TTDs and not claiming TTDs are both events outside of the ordinary course of business. Further, the evidence presented at trial demonstrates that Palmer acted within the ordinary

---

[160]    Tr. 557-58 (Palmer).

[161]    *Id.* at 634 (Katz).

[162]    VPH/VCH Opening Br. 50.

[163]    *Id.* at 49.

[164]    *Id.* at 50.

36

course of business, which VPH fails to refute.[165] Section 3.08(a) of the Agreement

requires Vestcom to have fully paid all taxes "due and payable"[166] as of closing.[167]

Any such payments "in the ordinary course of business [must be made] consistent

with past practice."[168] Palmer testified that his calculation of Vestcom's fourth

quarter tax liability complied with the Company's past practices.[169] Moreover,

VPH admits that the finance professionals at Lake Capital or the Stephens Group

did not coach Palmer into this interpretation.[170] Instead, Palmer, who knew about

the tax provisions of the Agreement,[171] estimated the Company's tax payment in

line with his understanding of Vestcom's normal course of business. VPH offers

---

[165] VPH also argues that LSVC's actions violate another term in Section 3.06, which bars Vestcom from "materially accelerat[ing] the collection of accounts receivable . . . for the purpose of increasing Cash on Hand." JX 75 § 3.06. Properly estimating one's tax liability is not the same as accelerating the collection of accounts receivable in order to increase cash.

[166] JX 75 § 3.08(a).

[167] *Id.* § 2.01(a).

[168] *Id.* § 5.01.

[169] Tr. 567 (Palmer). Palmer explained that "Vestcom's objective in calculating its estimated taxes was to accurately calculate its tax liability and then pay that amount," *id.* at 563-64 (Palmer), and that is precisely what he did with the tax payment challenged in this case. *Id.* at 567 (Palmer).

[170] VPH/VCH Opening Br. 37 (citing Tr. 528-29 (Palmer)). Sorrells also stated that he "never talked with [Palmer] about the mechanics of the [Agreement] at all." Tr. 1070-71 (Sorrells).

[171] Tr. 568-69 (Palmer).

no evidence that the Company's actions conflicted with the ordinary course of business or the past practices of Vestcom. Rather, VPH's tax expert explained that, absent some other agreement, "there is nothing improper" in LSVC claiming the full value of the TTDs pre-closing.[172]

### E.  LSVC's Interpretation Prevents an Absurd Result Under the Net Working Capital Adjustment

The Net Working Capital calculation also supports LSVC's—but not VPH's—view of the agreement. The parties agreed to adjust the purchase price based on any differences between the estimated net working capital at signing and the actual net working capital after VPH took control of the Company.[173] If VPH found the net working capital accounts lower than the estimates, then VPH would

---

[172]  *Id.* at 637-38 (Katz). VPH also contends that LSVC violated the covenant of good faith and fair dealing by claiming the TTDs pre-closing. VPH/VCH Opening Br. 51-52. The covenant protects "the spirit of an agreement when, without violating the express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." *Chamison v. HealthTrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999). As discussed, however, LSVC did not use oppressive or underhanded tactics to undercut the spirit of the agreement; rather, LSVC complied with the terms of the bargain, which provided for a payment from VPH to LSVC related to the value of any TTDs realized post-closing. Moreover, VPH asks the Court to apply the covenant of good faith and fair dealing to add a rejected term to the Agreement barring Vestcom from claiming any TTDs pre-closing. But the "covenant should not be used to fill the gap [in a contract] with a rejected term because doing so would grant a contractual protection that the party 'failed to secure . . . at the bargaining table.'" *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at \*16 (Del. Ch. Nov. 17, 2014) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004)).

[173]  JX 75 § 1.06(b).

receive the difference from an escrow account.[174] But if the actual net working capital account was greater than the estimate at signing, then VPH would owe LSVC the difference.

Net working capital increases (decreases) as accounts payable decreases (increases) and increases (decreases) as accounts receivable increase (decrease).[175] Income tax payables and receivables factor into net working capital under GAAP. LSVC argues that the structure of the net working capital adjustment implies that "any expected tax refund that would have resulted had Vestcom not used the TTDs to decrease its fourth quarter estimated taxes would have been paid for by VPH as an adjustment" to net working capital.[176] The idea is as follows: if LSVC overpaid its taxes in the fourth quarter of 2012, then VPH would receive a refund in 2013.[177] Expected tax refunds increase income tax receivables, which in turn increase net working capital and trigger a purchase price adjustment payment from VPH to LSVC.

---

[174]   *Id.* § 1.06(c)(i).

[175]   *Id.* at Art. X.

[176]   VPH/VCH Opening Br. 55.

[177]   The Agreement explicitly excludes cash on hand from the net working capital calculation. JX 75 Art. X. Thus, a change to the Company's cash holdings resulting from tax payments does not by itself affect the purchase price adjustment.

The issue is whether the Agreement provides for the inclusion of income tax receivables in the net working capital adjustment. Under GAAP, income tax receivables are listed as a current asset for the purpose of net working capital.[178] Section 1.06 of the Agreement stipulates that "Net Working Capital . . . be determined on a consolidated basis in accordance with GAAP,"[179] while the Net Working Capital definition states that "Net Working Capital shall be calculated in accordance with the Example Net Working Capital attached as Exhibit H."[180] Exhibit H does not include a line item for income tax receivable,[181] explicitly excludes income tax payables from the net working capital adjustment,[182] and does not comply with GAAP.[183] There is then a seeming ambiguity between whether GAAP or the accounting methodology from Exhibit H controls the accounting treatment of income tax receivables. I find that either accounting methodology dictates the same result.

---

[178]    *Id.*; LSVC Answering Br. 64.

[179]    JX 75 § 1.06(b).

[180]    *Id.* at Art. X.

[181]    *Id.* at Ex. H.

[182]    *Id.*

[183]    LSVC Answering Br. 64.

40

If GAAP controls, then an expected tax return from overpayment would reside as an income tax receivable in the net working capital calculation. This would increase net working capital, triggering a payment from VPH to LSVC.

If Exhibit H controls, then the question is whether net working capital as contemplated by the Agreement and Exhibit H includes income tax receivables. VPH points out that the Company's general ledger netted any income tax receivables against income tax payables in the payables line on the balance sheet.[184] But Palmer clarified that the Company's practice was to "adjust [the general ledger] at year-end with [the Company's tax advisor]" in order to satisfy GAAP.[185] I find Palmer's testimony highly credible. Palmer has been the CFO of Vestcom for six years, working at the Company before and after the sale under both LSVC and VPH ownership.[186] He was involved in the net working capital negotiations and preparation of the estimated closing balance sheet, providing him a valuable understanding of these terms.[187] Palmer also displayed a noteworthy degree of candor to the Court, for which the Court is greatly appreciative.

---

[184]     Tr. 544 (Palmer).

[185]     *Id.* at 601 (Palmer).

[186]     *Id.* at 501 (Palmer).

[187]     *Id.* at 598, 601 (Palmer).

41

VPH replies that because Exhibit H excludes income tax payables from the defined net working capital adjustment, the Agreement also excludes income tax receivables from that calculation. But VPH ignores the remainder of Palmer's explanation. Palmer testified that he did not believe the Agreement excluded income tax receivables from the net working capital adjustment.[188] He noted that the Agreement explicitly removes cash, deferred tax assets, accounts payable, accrued expenses, deferred revenue, certain restructuring charges, accrued severance and related benefits, and accrued litigation settlement payments from the definition of net working capital.[189] This highly negotiated list of exclusions does not include receivables. And Exhibit H lacks a line item for income tax receivables only because Vestcom was not expecting a tax receivable as of October 2012.[190] Palmer stated that, in the event of an expected $6 million refund, he would have "read [the Agreement] at the time and understood it just as it's written"[191] and then ordered the Company "controller . . . [to] break [income tax receivables] out as a current asset."[192] Palmer further noted that such a "significant, several million

---

[188]   *Id.* at 602 (Palmer).

[189]   *Id.* at 605 (Palmer). *See* JX 75 Art. X.

[190]   Tr. 603 (Palmer).

[191]   *Id.* at 602 (Palmer).

[192]   *Id.* at 604 (Palmer).

dollar[]" expected refund would warrant an accounts receivable line item because "[i]t would have looked very strange to have a $6 million debit balance in current liabilities."[193] Thus, the result under the Agreement of a tax overpayment is the creation of a receivable, which increases net working capital and obligates a payment from VPH to LSVC under the purchase price adjustment.

VPH points out that this creates an illogical result if the Agreement also requires that Vestcom overpay its taxes by $6 million before closing.[194] If LSVC paid an extra $6 million in pre-closing taxes, then VPH would owe both the cost of the net working capital adjustment increase as a result of the new receivable (the expected tax refund) and half the value of that later-realized tax refund, meaning that VPH would effectively pay 150% for the value of the TTDs. VPH is correct that this would be an unusual provision.[195] But such an absurd outcome directly results from VPH's argument that the Agreement requires a $6 million overpayment. Instead, LSVC provides a functional understanding of the Agreement that does not obligate VPH to make such unusual payments.

---

[193]    *Id.*

[194]    VPH/VCH Opening Br. 54-55.

[195]    And VPH states that such an arrangement was not the deal. Tr. 70 (Civantos).

## III.    CONCLUSION

For the foregoing reasons, I find in favor of LSVC and conclude that the Agreement permitted Vestcom to claim the TTDs pre-closing.

**IT IS SO ORDERED**.